# NO. 12-06-00408-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *COLTON WEIR,*<br>*APPELLANT* | § | *APPEAL FROM THE 420TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

A jury convicted Appellant Colton Weir of the offense of murder for remuneration and assessed his punishment at imprisonment for life without the possibility of parole. Appellant brings three issues challenging the admission in evidence of his statement to law enforcement officers, and contending the evidence is legally and factually insufficient to support his conviction. We affirm.

## BACKGROUND

Appellant was fifteen years of age at the time of James Kelly's murder. Witnesses described him as "socially immature," "of below average intelligence," and "easily led" but intensely loyal to his friends. In the months leading up to James Kelly's murder, Appellant was befriended by James Kelly's stepdaughter, Shaina Sepulvado, age sixteen, and her boyfriend, Dallas Christian, age twenty-three. Shaina was "wild," "out of control," and "running the roads." At fifteen, she had already been the live-in girlfriend of another man before Dallas Christian. Shaina fiercely resented her stepfather's attempts to restrain her. Her mother, Marcia Kelly, shared that resentment. Instead of supporting James Kelly's efforts to discipline Shaina, Marcia Kelly rewarded her misbehavior by giving her a car.

Appellant was moved by Shaina's accounts of how her stepfather mistreated her, had her arrested, and had beaten his son. A few weeks before the murder, Shaina told a group that included Appellant that her mother would give someone money and a truck to kill James Kelly. Approximately three weeks before the murder, Appellant, in separate conversations with his uncle and cousin, said that Marcia Kelly had promised him $10,000 and a dually pickup to kill James Kelly. Appellant asked his uncle to take care of his mother if something went wrong. At that time, Appellant's uncle returned Appellant's 30-30 rifle to him.

On the night of the murder, Dallas Christian, Shaina, Appellant, and two others drove to James Kelly's house. Shaina and Appellant got out and went to the back of the car where Appellant apparently got his rifle. Shaina and Appellant disappeared in the darkness walking toward the house. The three who remained in the car heard a noise like a gunshot. Shaina returned to the car followed by Appellant. They put the gun in the trunk and got into the car. Appellant said, "Go, go, we just killed James." Dallas Christian drove to the Goodman Bridge where Appellant threw the rifle in the middle of the Angelina River.

James Kelly's body was discovered very early the next morning. Almost immediately Appellant became a suspect. Late that afternoon Appellant was picked up for questioning. Chief Deputy Douglas Richardson took Appellant before Judge Donna Clayton who administered to him the warnings mandated by Texas Family Code section 51.095. Juvenile Probation Officer Nicole Boyles was present throughout Deputy Richardson's subsequent interrogation of Appellant. Appellant made a written statement, which he signed in the presence of Judge Donna Clayton who examined him independently from any enforcement officer or prosecutor to determine if he had voluntarily waived his rights and understood the nature and contents of the statement.

The juvenile court approved the State's motion for discretionary transfer to the district court for criminal proceedings.

### FAILURE TO SUPPRESS APPELLANT'S STATEMENT

In his first issue, Appellant contends the trial court erred in admitting his statement in evidence.

2

## Standard of Review

In reviewing a trial court's decision on a motion to suppress evidence, the court of appeals gives almost total deference to the trial court's determination of historical fact. ***Guzman v. State***, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We review de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. ***Laney v. State***, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003). We sustain the trial court's ruling if it is reasonably supported by the record and correct under any applicable theory of law. ***Id.***

## Applicable Law

A written statement of a child made while the child is in custody is admissible if:

. . . .

> (A) the statement shows that the child has at some time before the making of the statement received from a magistrate a warning that:
>
>> (i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;
>>
>> (ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;
>>
>> (iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and
>>
>> (iv) the child has the right to terminate the interview at any time;
>
> (B) and:
>
>> (i) the statement must be signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer if a bailiff is not available to be present if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that the bailiff or law enforcement officer may not carry a weapon in the presence of the child; and
>>
>> (ii) the magistrate must be fully convinced that the child understands the nature and contents of the statement and that the child is signing the same voluntarily, and if a statement is taken, the magistrate must sign a written statement verifying the foregoing requisites have been met;
>
> (C) the child knowingly, intelligently, and voluntarily waives these rights before and during the making of the statement and signs the statement in the presence of a magistrate; and
>
> (D) the magistrate certifies that the magistrate has examined the child independent of any law

3

enforcement officer or prosecuting attorney, except as required to ensure the personal safety of the magistrate or other court personnel, and has determined that the child understands the nature and contents of the statement and has knowingly, intelligently, and voluntarily waived these rights; . . .

TEX. FAM. CODE ANN. § 51.095(a)(1) (Vernon Supp. 2007).

The Family Code also requires that "[a] person taking a child into custody shall promptly give notice of the person's action and a statement of the reason for taking the child into custody to . . . the child's parent, guardian or custodian. . . ." TEX. FAM. CODE ANN. § 52.02(b)(1) (Vernon Supp. 2007). However, unlike section 51.095, section 52.02(b) is not an independent exclusionary statute. **Gonzales v. State**, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002). If evidence is to be excluded because of a violation of section 52.02(b), it must be excluded through the operation of Texas Code of Criminal Procedure article 38.23(a), which prohibits the admission of evidence obtained in violation of the constitution or laws of the State of Texas. **Id.**; see also TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). However, evidence is not obtained in violation of the law if there is no causal connection between the illegal conduct and the acquisition of the evidence. **Gonzales**, 67 S.W.3d at 912. Therefore, before a juvenile's statement can be excluded because of a violation of section 52.02(b), there must be a causal connection shown between the violation and the acquisition of the statement. **Id.** In a motion to suppress evidence obtained in violation of the law, the defendant, as moving party, bears the burden of producing evidence of such a causal connection. **Pham v. State**, 175 S.W.3d 767, 774 (Tex. Crim. App. 2005).

**Discussion**

Appellant contends that there is no direct evidence that his mother was notified that he was taken into custody or the reason for his arrest. Appellant points to the evidence of his below average intellect, lack of responsibility and social skills, and the devastating effect on him of the recent deaths of his father and grandfather. These circumstances, he argues, when considered with the absence of his surviving parent and his distraught state during the interview, demonstrate that he lacked the capacity to make a voluntary statement. The State, he contends, did not meet its burden of showing that the statement was not the product of psychological disadvantage.

Appellant was taken into custody on Sunday afternoon. Appellant's mother was at work at Wal-Mart at that time. Nicole Boyles, the probation officer, testified that she believed several efforts

4

were made to contact Appellant's parent, but there is no testimony that those efforts succeeded. Nevertheless, according to Boyles, Appellant's mother arrived at the location where he was being detained within one and one-half hours after Appellant was taken into custody. Boyles told the court that she informed all the parents "what was going on." Appellant's interrogation lasted approximately forty-five minutes. Appellant never asked to see his mother or speak with her during the interview. It is Appellant's burden to show a violation of section 52.02(b) and that, but for that violation, he would have chosen not to make a statement. Appellant has failed to show such a violation. Viewed in the light most favorable to the trial court's ruling, the record shows that an effort was made to contact Appellant's mother. Appellant's cousin told her that Appellant had been taken into custody and she appeared at the place of his detention approximately one and one-half hours after he was detained. Notification within one and one-half hours satisfies the section 52.02(b) requirement of prompt notice. *See, e.g., **Vann v. State**,* 93 S.W.3d 182, 185 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd) (two and one-half hours not unnecessary delay and complied with section 52.02(b)). The juvenile probation officer explained "what was going on" to her. It is reasonable to assume that this included the reason for taking Appellant into custody. We conclude that there was no section 52.02(b) violation.

However, even assuming such a violation, Appellant has failed to show a causal connection between the violation and his decision to make a statement. In **Simpson v. State**, 51 S.W.3d 633 (Tex. App.–Tyler 2003), *judgment vacated and remanded on other grounds*, 74 S.W.3d 408, 408-09 (Tex. Crim. App. 2002), we held that a seven and one-half hour interrogation coupled with the failure to notify the defendant's mother for forty-eight hours indicated coercive conduct by the officers taking his statement. *Id.* at 636–37. In the case at bar, however, Appellant's interrogation lasted only approximately forty-five minutes. Appellant never asked to see his mother or speak with her during the interview. Although Appellant was emotionally upset during the questioning, there is no evidence of coercive conduct by the officer conducting the interrogation.

Appellant also maintains that the State failed to comply with section 51.095(a)(1)(A) because Judge Clayton neglected to obtain Appellant's initials on the Magistrate's Juvenile Warning beside each of the warnings required. However, Appellant signed and circled "yes" at the bottom of the warning acknowledging that he had "listened carefully to and understood each of the above rights

as they were read and explained to me." The Family Code does not mandate the individual acknowledgment of each right by the child. It need only show that, before the making of a statement, the magistrate warned the child regarding each of the rights. TEX. FAM. CODE ANN. § 51.095(a)(1). The magistrate also certified that "the foregoing statutory rights were read and explained to the said juvenile." There was no failure to comply with section 51.095.

The trial court did not err in denying Appellant's motion to suppress. Appellant's first issue is overruled.

## SUFFICIENCY OF THE EVIDENCE OF REMUNERATION

In his second and third issues, Appellant challenges the legal and factual sufficiency of the evidence that he committed the murder for remuneration.

### Standard of Review

The standard for reviewing a legal sufficiency challenge is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317-18, 99 S. Ct. 2781, 2788-89, 61 L. Ed. 2d 560 (1979); *see also Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). In reviewing factual sufficiency, we must ask whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine our confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *see also Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).

### Applicable Law

A person commits a capital felony if the person commits murder for remuneration or the promise of remuneration or employs another to commit murder for remuneration or the promise of remuneration. TEX. PENAL CODE ANN. § 19.03(a)(3),(b) (Vernon Supp. 2007-08). In *Beets v. State*, 767 S.W.2d 711 (Tex. Crim. App. 1987), the court of criminal appeals explained

> that the definition of "remuneration" does not mandate the narrow construction requiring salary, payment, or reward paid to an agent by his principal as in a strict murder for hire situation. Remunerate encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act.

6

*Id.* at 734. The court concluded that

> the existence of a culpable promisor is not required to establish remuneration. . . . The focus is on the actor's intent or state of mind: Did the actor kill in the expectation of receiving some benefit or compensation . . . ?

*Id.* at 735. In ***Underwood v. State***, 853 S.W.2d 858 (Tex. App.–Fort Worth 1993, no pet.), Underwood offered to kill four people to be named by his former cellmate in exchange for the former cellmate's killing of two investigators working on the murder case against Underwood. The court held this was sufficient evidence of remuneration, rejecting Underwood's contention that "remuneration" is limited to pecuniary gain. *Id.* at 860.

## Discussion

Appellant argues that the record fails to show that any offer of remuneration was actually made, that he accepted such an offer, or that he actually acted on the basis of an offer of remuneration. Appellant acknowledges that Jimmy Ming, Appellant's uncle, testified that Appellant told him that "he was going to get $10,000 and a brand new Ford, four wheel drive, diesel, dually pickup, and a pair of jet skis . . . for killing James Kelly." Michael Watson, Appellant's cousin, testified about a similar conversation with Appellant, stating that "[h]e told me that Marcia [Kelly] wanted to hire him to kill James." Watson recalled that Appellant told him that Marcia would give him "a pickup, $10,000.00, a jet ski and a four-wheeler." Appellant argues that neither Ming nor Watson took his statements seriously at the time they were made.

Appellant's reliance on contract principles is misplaced. Neither an express agreement nor a culpable promisor need be proven to establish remuneration. Rather, the focus is on the actor's intent or state of mind, and the question is whether the actor killed in the expectation of receiving some benefit or compensation. ***Beets***, 767 S.W.2d at 735.

Appellant also argues that his statements regarding what Marcia would pay him for the murder should have been given no weight by the jury because they were not taken seriously by the witnesses who heard him make them. However, in the light of Appellant's subsequent murder of James Kelly, Appellant's statements are indicative of his state of mind – what he expected for killing James Kelly.

7

Other evidence showed that Appellant knew that Marcia Kelly was offering money and a truck for the murder of her husband. Thomas Dixon, a friend of Appellant, testified that Appellant and Dallas Christian asked him if he knew someone who would kill for money. Another friend, Paul Buchanan, testified that he was in the car with Shaina and Appellant when Shaina claimed her mother was offering money and a truck for the murder of James Kelly.

It is possible to speculate that Appellant's motives were mixed; that he was moved to commit the crime out of loyalty to the little group that accepted him, or that he also may have been motivated to kill James Kelly in revenge for his supposed mistreatment of Shaina. But there is abundant evidence in the record from which the jury might reasonably have inferred that Appellant killed James Kelly in expectation of a financial reward. The evidence of remuneration is both legally and factually sufficient. Appellant's second and third issues are overruled.

### DISPOSITION

The judgment of the trial court is ***affirmed***.


    BILL BASS
Justice


Opinion delivered June 11, 2008.
*Panel consisted of Griffith, J., Hoyle, J., and Bass, Retired Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.*


(DO NOT PUBLISH)

8